UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
JEEHYUNG THOMAS SONG,                        :
                         Plaintiff,          :
                                             :
v.                                           :          **OPINION AND ORDER**
                                             :
LAWRENCE C. TURTIL,                          :          21 CV 2269 (VB)
                         Defendant.          :
--------------------------------------------------------------x

Briccetti, J.:

      Pro se plaintiff Jeehyung Thomas Song asserts claims against his former psychiatrist,

defendant Dr. Lawrence C. Turtil, for medical malpractice, defamation, and negligent infliction

of emotional distress ("NIED").  Plaintiff's claims arise from treatment Dr. Turtil provided to

plaintiff between February and May 2020, Dr. Turtil's alleged failure to provide appropriate care

to plaintiff after plaintiff terminated their doctor-patient relationship, and certain statements Dr.

Turtil made to a child custody evaluator in connection with plaintiff's divorce proceedings.

      Before the Court is Dr. Turtil's unopposed motion for summary judgment.  (Doc. #71).[1]

      For the reasons set forth below, the motion is GRANTED.

      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

---

[1]     Despite having received two sua sponte extensions of time to file an opposition to
defendant's motion, as well as of his time to file his own cross-motion for summary judgment,
and a warning that defendant's motion would be deemed fully submitted and unopposed if
plaintiff failed to respond (Docs. ##72, 73), plaintiff filed neither an opposition nor a cross-
motion.  Thus, by Order dated October 11, 2022, the Court deemed defendant's motion fully
submitted and unopposed, and ordered that plaintiff could not file a cross-motion.  (Doc. #74).

**BACKGROUND**

Plaintiff submitted several exhibits with his amended complaint,[2] and Dr. Turtil has submitted a memorandum of law, a statement of material facts pursuant to Local Civil Rule 56.1,[3] and a declaration with exhibits, which together reflect the following factual background.

Plaintiff was Dr. Turtil's patient from August 2005 to May 18, 2020.

Plaintiff was referred to Dr. Turtil around August 2005 by the New York Presbyterian/Cornell Westchester psychiatric facility, after he was hospitalized for three weeks for acute bipolar disorder, depressive, with psychotic features. Plaintiff's medication regimen at discharge included Klonopin, Risperdal, Wellbutrin, Lithium, Depakote, and Cogentin.

On August 2, 2005, plaintiff had his first appointment with Dr. Turtil for a comprehensive evaluation and medication management. Plaintiff's wife, Jane Song, also came to the appointment and provided additional medical history. Dr. Turtil directed plaintiff to continue taking the medications prescribed at discharge.

Plaintiff saw Dr. Turtil weekly or biweekly over the next two months, and then monthly through September 2008. Dr. Turtil monitored plaintiff's mental status and blood levels, and occasionally adjusted plaintiff's medication and dosage. Ms. Song periodically joined plaintiff at these appointments. In addition, plaintiff and his wife saw Dr. Turtil for marriage counseling in 2006.

---

[2]     Attached to the amended complaint (Doc. #15 ("AC")) are ten exhibits, cited herein as "P-[ ]." The Court considers plaintiff's exhibits here, to the extent their authenticity is undisputed.

[3]     Because plaintiff failed to submit a counterstatement pursuant to Local Civil Rule 56.1(b), the Court deems the facts set forth in Dr. Turtil's Rule 56.1 Statement to be undisputed. See Local Civil Rule 56.1(c).

In February 2006, Dr. Turtil put plaintiff on Synthroid to treat hypothyroidism, a thyroid hormone deficiency.  According to Dr. Turtil's records, lab tests reflected abnormal levels of thyroid stimulating hormone ("TSH") in plaintiff's blood.

From February 2007 to September 2008, plaintiff gradually tapered off all medications. He continued seeing a therapist who had been treating him since 2005.  Dr. Turtil remained available for medication management if plaintiff's symptoms worsened.

In April 2009, concerned he was cycling back into a depression, plaintiff met with Dr. Turtil and put himself back on Depakote at 250 milligrams daily.  The Depakote dosage was increased to 500 milligrams in June 2009.

Plaintiff returned to Dr. Turtil in August 2009.  Dr. Turtil noted plaintiff was possibly having a recurrence of a bipolar psychotic episode.  However, because plaintiff insisted on being medication free, Dr. Turtil recommended reducing Depakote by 125 milligrams per week for three weeks.

Plaintiff saw Dr. Turtil again in November 2009.  Plaintiff was medication free and his symptoms seemed to be improving.  Dr. Turtil advised plaintiff to continue seeing a therapist. This was plaintiff's last appointment with Dr. Turtil until January 2011.

On January 8, 2011, plaintiff was brought to New York Presbyterian Westchester by police, with the assistance of a crisis team.  Dr. Turtil assisted in getting plaintiff admitted to the hospital.

At that point, plaintiff had been exhibiting signs of mania for a week.  According to a police report, plaintiff's wife called Dr. Turtil "terrified," and Dr. Turtil then called the police. (Doc. #71-12 ("2011 Police Report") at 2).  The report further indicates that the responding officers "determined that [plaintiff] was a threat to himself and others."  (Id. at 3).

3

Plaintiff tried to leave the hospital against medical advice and refused medications.  The hospital ultimately obtained a court order permitting involuntary hospitalization and medication over objection.  Thereafter, plaintiff became compliant with his medication regimen.  He was discharged on January 26, 2011.

The next day, plaintiff and his wife met with Dr. Turtil at Dr. Turtil's office.  Plaintiff denied he had bipolar disorder and claimed he was having a religious experience.  He also said he was a sex addict and had recently stopped masturbating; he attributed his manic behavior to withdrawal from the "drug" of masturbation.  (Doc. #71-15 ("Statement of Facts") ¶ 28).  Dr. Turtil told plaintiff to continue taking the medications prescribed by the hospital, including Depakote, Risperdal, and Ativan.

From February 2011 through the end of 2015, plaintiff saw Dr. Turtil on a biweekly (every other week) basis.  In July 2011, Dr. Turtil diagnosed plaintiff with "Subclinical Hypothyroidism" and put him back on Synthroid.  (Doc. #71-2 ("Progress Notes") at 78).  Dr. Turtil also periodically adjusted plaintiff's other medications and dosages.  Plaintiff appeared generally stable from 2012 to 2015, occasionally reporting insomnia or problems with work and his marriage.  He tapered off Risperdal in 2012 and Ativan in 2013.  However, he began taking them again in May 2015 due to increased manic symptoms after the stillbirth of his child and a hospitalization for Bell's palsy.

Plaintiff continued to see Dr. Turtil monthly from January 2016 to February 2020.

Through 2016, plaintiff reported symptoms of depression and low mood, as well as occasional unhappiness with his job.  After his daughter was born in August 2016, plaintiff also reported feeling overwhelmed with his new role as a parent.  Dr. Turtil increased the Risperdal

dosage throughout the year.  In December 2016, plaintiff started a trial of the antidepressant Celexa, but discontinued it a month later due to various side effects.

In 2017, plaintiff began taking Zoloft for depression, and reported improvement in his symptoms.  He tapered off Wellbutrin, which Dr. Turtil noted had "stopped working."  (Progress Notes at 221).  Dr. Turtil also gradually reduced the Risperdal dosage from 2.25 milligrams to 0.25 milligrams.

By May 2018, plaintiff stopped taking Risperdal; he continued to take Depakote, Ativan, Synthroid, and Zoloft.  Through 2018, plaintiff reported issues with his wife and in-laws. Plaintiff was sleeping only three to four hours a night, which he attributed to his wife going to bed late and sleeping through the day.  At multiple visits, plaintiff asked Dr. Turtil to increase his Zoloft dosage.  However, Dr. Turtil declined to do so, due to concern that the increased dose would result in a manic episode.  Dr. Turtil also encouraged plaintiff to get more sleep.

From July through November 2019, Dr. Turtil directed plaintiff to taper off Zoloft and Depakote.  However, Dr. Turtil noted plaintiff was self-medicating throughout this time.  In October 2019, plaintiff reported taking an extra 250 milligrams of Depakote (although it was unclear whether he did so only once or consistently).  And, ignoring Dr. Turtil's instructions to decrease Zoloft to below 75 milligrams, plaintiff began taking 100 milligrams of Zoloft in November 2019 and then 125 milligrams in December 2019.

In late 2019 through early 2020, plaintiff continued to report marital issues.  Plaintiff and his wife began seeing a new family therapist.  A handwritten note from plaintiff in Dr. Turtil's records, dated January 16, 2020, gave Dr. Turtil permission to speak to the couple's therapist, such permission to expire in six months.

On January 16, 2020, plaintiff saw Dr. Turtil and reported that he continued to take 125 milligrams of Zoloft.  He refused to consider decreasing the Zoloft dosage or increasing the Depakote.

On February 28, 2020, plaintiff returned to Dr. Turtil for another visit.  Plaintiff remained unwilling to decrease his Zoloft dosage, even though Dr. Turtil again expressed concern that the higher dose would fuel a manic episode.  In addition, plaintiff refused to consider increasing the Depakote or going back on Risperdal, even though Dr. Turtil believed plaintiff needed it.  At this visit, they discussed multiple issues including a recent call to Dr. Turtil from plaintiff's wife, plaintiff's apparent use of medical jargon and attempts to do therapy on his wife, and plaintiff's apparent lack of trust in the couple's therapist.

Plaintiff saw Dr. Turtil again on March 12, 2020.  They discussed plaintiff's recent bout of insomnia and another call to Dr. Turtil from plaintiff's wife, who raised concerns about plaintiff setting up a secret corporation.  Dr. Turtil again recommended lowering plaintiff's Zoloft, increasing Depakote, and starting Risperdal.  However, plaintiff refused those recommendations and continued to take an increased dose of Zoloft despite repeated warnings from Dr. Turtil about the risk of another manic episode.

At their next visit, on March 26, 2020, Dr. Turtil noted he had received multiple calls from plaintiff's wife and the couple's therapist with concerns that plaintiff was manic and argumentative both at home and in therapy.  Plaintiff again refused to decrease his dose of Zoloft or to restart Risperdal.

On April 2, 2020, with the COVID-19 pandemic having reached the northeastern United States, plaintiff called in for a session with Dr. Turtil.  They discussed plaintiff's concerns about the pandemic and his marriage.  Plaintiff said he had lowered his Zoloft to 125 milligrams but

would not reduce it further.  He refused any recommendations from Dr. Turtil regarding his medication.

On April 27, 2020, plaintiff met with Dr. Turtil via FaceTime.  He claimed he was taking 100 milligrams of Zoloft, but continued to object to changes to his medication regimen.  And he was adamant in his refusal to start Risperdal.  Plaintiff reported he was under a tremendous amount of stress on multiple fronts and did not know when it would end.  Dr. Turtil's impression of plaintiff's mental status, as recorded in his chart, was "Bipolar Mixed Mania/Depression driven by misuse of Zoloft prescription."  (Progress Notes at 271).

On May 7, 2020, plaintiff had another FaceTime session with Dr. Turtil.  Plaintiff reported he had lowered his Zoloft dosage to 75 milligrams, increased his Depakote as instructed to 1,250 milligrams, and started taking Risperdal.  Plaintiff also discussed struggles with his family relationships, job stress, and COVID-19.  Dr. Turtil recorded his impression that plaintiff was "[c]urrently hypomanic and lacking in insight and lacking in compliance" and suffering from "bipolar Mixed Mania/Depression."  (Progress Notes at 272).

On May 18, 2020, plaintiff met with Dr. Turtil via FaceTime for a monthly medication follow-up.  At this session, plaintiff informed Dr. Turtil of his intention to terminate their doctor-patient relationship and find a new psychiatrist.  Plaintiff discussed his perception of how annoying Dr. Turtil was.  Plaintiff also reported sleeping about two hours per night.  Plaintiff again claimed he had lowered his Zoloft dosage and increased Depakote as instructed and that he was taking 0.5 milligrams of Risperdal.  However, Dr. Turtil doubted plaintiff's compliance with the medication regimen.  This was plaintiff's last visit with Dr. Turtil and the end of Dr. Turtil's records on plaintiff.

By June 2020, plaintiff began seeing other psychiatric providers.

From June 7 to November 13, 2020, Dr. Turtil received several calls from plaintiff's wife, which plaintiff discovered by reviewing cell phone records.

On August 3, 2020, plaintiff's wife called Dr. Turtil, reporting that plaintiff had locked her out of the house and was alone in the house with their three-year-old daughter. At Dr. Turtil's recommendation, she called 911. She told the dispatcher plaintiff had not "been taking his medications." (P-E at ECF 84).[4] She also told the dispatcher "his doctor" said people "who are familiar with bipolar disorder/mental illness . . . should come with an ambulance," and plaintiff "could possibly be taken to the hospital." (Id.). Plaintiff testified at his deposition that when the police entered the house, he was holding a black iPhone and a police officer, "in a very loud and kind of shocking way," asked plaintiff what he was holding; plaintiff feared the officer would mistake his phone for a handgun and would injure or shoot him. (Doc. #71-6 ("Song Tr.") at 35–36). The officers searched plaintiff, then questioned him in his living room. Plaintiff declined the officers' request that he accompany them to the hospital. However, that evening, plaintiff's wife obtained a temporary restraining order against him, and plaintiff "was removed from the house." (Id. at 48). Plaintiff testified he suffers from post-traumatic stress disorder ("PTSD") from the fear he experienced on August 3.

On August 8, 2020, plaintiff reached out to Dr. Turtil to schedule an appointment. Dr. Turtil texted plaintiff that he would respond the next day, but did not ultimately follow up on plaintiff's request for an appointment.

Plaintiff's wife filed for divorce on August 10, 2020. Pursuant to an October 2020 consent order in the divorce proceeding, plaintiff was entitled only to a few hours of supervised parenting time, once a week, and FaceTime calls with his daughter every other evening. Plaintiff

---

[4]    "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

applied to modify the order, seeking "joint legal custody, primary residential custody, and no overnight parenting time for Ms. Song except on vacation."  (Doc. #71-10 ("Custody Evaluation") at 2).

Plaintiff's wife opposed joint custody because of her belief that plaintiff "presented a safety risk to their daughter based on plaintiff's history of aggressive behavior with her (Ms. Song)" and that plaintiff was experiencing, but not treating, a bipolar episode at the time. (Custody Evaluation at 2).  However, plaintiff's wife expressed willingness to share custody if he "became well."  (Id.).  Plaintiff denied being mentally unstable, and further claimed his wife had subjected him to "domestic violence, psychological and physical abuse."  (Id. at 4).  **Plaintiff's application for joint legal custody was denied pending** "Diagnostic Evaluations [of plaintiff and his wife] to determine custody and parenting time regarding their four-year-old daughter," to be conducted by a court-appointed evaluator, Bergen Family Center.  (Id. at 2).

On April 13, 2021, Dr. Turtil spoke with Connie Ritzler, an evaluator with the Bergen Family Center, concerning the psychiatric treatment Dr. Turtil provided to plaintiff from 2005 to May 2020.  Before the interview, Dr. Turtil obtained plaintiff's signed authorization to speak with Ritzler about plaintiff's "[m]edical information including exam results / assessment / prognosis / treatment recommendations."  (Doc. #71-3 ("Medical Records") at 162).

**DISCUSSION**

I.    Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[5]

A fact is material when it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him.  Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

---

[5]      Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

"Where, as here, a party has not opposed a motion for summary judgment, 'the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed.'"  Slep-Tone Entm't Corp. v. Golf 600 Inc., 193 F. Supp. 3d 292, 295 (S.D.N.Y. 2016) (quoting Jackson v. Fed. Express, 766 F.3d 189, 194 (2d Cir. 2014)).  Indeed, if a party has not opposed the motion, the Court may grant summary judgment only "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).

In deciding a motion for summary judgment, the Court may consider only evidence that would be admissible at trial.  Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).  The burden to proffer admissible evidence applies "equally to pro se litigants."  Varughese v. Mt. Sinai Med. Ctr., 2015 WL 1499618, at *4 (S.D.N.Y. Mar. 27, 2015) (citing Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)).[6]  Accordingly, bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

---

[6]     Plaintiff will be provided copies of all unpublished opinions cited in this decision.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

II.     Medical Malpractice Claims

Plaintiff's medical malpractice claims are premised on several purported deviations from accepted medical practice:  (i) improper medication management, i.e., over-prescribing, and harassing plaintiff to take, Risperdal; (ii) failing to adequately inform plaintiff about medications; (iii) practicing out of scope by treating plaintiff for hypothyroidism; (iv) failing to appropriately evaluate plaintiff; (v) improperly communicating with plaintiff's wife and failing to inform plaintiff of those communications; and (vi) failing to provide aftercare.

Dr. Turtil argues plaintiff's medical malpractice claims must be dismissed because plaintiff offers no expert testimony to rebut Dr. Turtil's prima facie showing that he neither deviated from accepted standards of medical care nor proximately caused plaintiff's alleged injuries.

The Court agrees.

A.     Legal Standard

Under New York law,[7] "the 'essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury.'"  Doane v. United States, 369 F. Supp. 3d 422, 446 (N.D.N.Y. 2019) (quoting DiMitri v. Monsouri, 302 A.D.2d 420, 421 (2d Dep't 2003)).  "[E]xcept as to matters within the ordinary experience and knowledge of laymen, expert medical opinion evidence is required" to establish both elements.  Fiore v. Galang, 64 N.Y.2d 999, 1001 (1985)).

In moving for summary judgment, a defendant must make a prima facie showing "either that he or she did not depart from good and accepted medical practice or that any departure did

---

[7]     The parties do not dispute that New York substantive law applies to plaintiff's claims. See Cargo Partner AG v. Albatrans Inc., 207 F. Supp. 2d 86, 93 (S.D.N.Y. 2002), aff'd, 352 F.3d 41 (2d Cir. 2003) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.").

not proximately cause plaintiff's injuries." Ducasse v. New York City Health & Hosps. Corp., 148 A.D.3d 434, 435 (1st Dep't 2017). "Once a defendant has established prima facie entitlement to summary judgment, the burden shifts to plaintiff to rebut the prima facie showing via medical evidence attesting that the defendant departed from accepted medical practice and that such departure was a proximate cause of the injuries alleged." Id.

"As regards the human body, its capacities and tolerances, it is a rare case where common knowledge is sufficient to show that an injury would not have occurred without negligence." Streeter v. Ackerman, M.D., 2003 WL 21960351, at *1 (Sup. Ct., App. Term, 1st Dep't Aug. 8, 2003). Even when a lay jury is competent to evaluate whether the physician was negligent, expert testimony may be necessary to establish such negligence proximately caused the plaintiff's injury, as "there lurks the ever present possibility that it was the patient's original affliction rather than the physician's negligence which caused the ultimate damage." Sitts v. United States, 811 F.2d 736, 740 (2d Cir. 1987) (quoting Monahan v. Weichert, 82 A.D.2d 102, 107 (4th Dep't 1981)).

B.    Application

As an initial matter, plaintiff has urged the Court to find that the opinions plaintiff offers in his self-authored report (Doc. #56) are admissible as expert testimony, or if not expert testimony, are nevertheless admissible because the alleged acts of medical malpractice "are plainly accessible to a lay jury and need no expert opinion to assist the trier-of-fact." (Doc. #69 at 2). The Court declines to do so. Having again reviewed Magistrate Judge Krause's April 27, 2022, Decision and Order (Doc. #59), plaintiff's report, and the parties' briefing on the issue, the Court agrees with Judge Krause that plaintiff "does not have the requisite qualifications to serve as an expert in this matter." (Id. at 12). Furthermore, even if plaintiff were correct that the

alleged acts of medical malpractice are accessible to a lay jury, proximate cause is not.  Without

the assistance of expert testimony, a jury would not be able to ascertain whether "it was

[plaintiff's] original affliction rather than [Dr. Turtil's] negligence which caused the ultimate

damage" alleged here, including the deterioration of plaintiff's marriage, his separation from his

daughter, and his inability to work.  Sitts v. United States, 811 F.2d at 740.

Moreover, Dr. Turtil has proffered sufficient evidence to make a prima facie showing that

he is entitled to summary judgment on plaintiff's malpractice claims.

In support of his motion, Dr. Turtil submitted the report of a medical expert, Dr. Paul S.

Appelbaum, in which Dr. Appelbaum concludes "all treatment provided by Dr. Turtil in this case

was consistent with good and accepted practices," and "the care he provided was not, in whole or

in part, a proximate cause of the plaintiff's injuries."  (Doc. #71-9 ("Appelbaum Report") at 7).

First, with respect to plaintiff's claim based on medication management, Dr. Appelbaum

opined "[t]he choice of medication was appropriate, as well as the dosages—except when Mr.

Song deviated from Dr. Turtil's recommendations."  (Appelbaum Report at 8).  Dr. Appelbaum

also concluded plaintiff's "concerns about medication were taken into consideration with regard

to the medications and dosages prescribed for him, such as when he had a poor reaction to a

medication (e.g., Celexa) or when it stopped working for him (e.g., Wellbutrin)."  Id.  Thus, Dr.

Appelbaum concluded "there is no evidence that the plaintiff was being overmedicated, as he

claims."  Id.

Second, with respect to plaintiff's claim based on informed consent, Dr. Appelbaum

opined that "[i]f a psychiatrist is recommending restarting a medication with which the patient

has had previous experience," as plaintiff had with Risperdal, "a condensed discussion about the

risks and benefits of that medication is reasonable and within the standard of care."  (Appelbaum

Report at 9).  Judged by that standard, Dr. Appelbaum concluded Dr. Turtil's "records, together with the testimonies of Dr. Turtil and the plaintiff, all establish that the plaintiff was adequately informed about the risks and benefits of medications, particularly Risperdal."  (Id.).

Third, with respect to plaintiff's claim based on treatment for hypothyroidism, Dr. Appelbaum opined "[t]he fact that [Dr. Turtil] prescribed Synthroid or monitored plaintiff['s] thyroid levels was not a sign that [Dr. Turtil] was 'practicing out of scope,'" and thus, not evidence that Dr. Turtil departed from any standard of care.  (Appelbaum Report at 7).  To the contrary, Dr. Appelbaum opined that thyroid hormone levels may affect a patient's mental health and impact the effectiveness of psychiatric medications; as such, "[c]orrecting abnormal thyroid hormone levels can be an important part of the treatment for psychiatric conditions."  (Id.).

Fourth, with respect to plaintiff's claim that Dr. Turtil failed to appropriately evaluate him, Dr. Appelbaum opined that because "[p]laintiff was a long-term patient of Dr. Turtil, . . . a full psychiatric evaluation was not necessary at each appointment."  (Appelbaum Report at 9). Instead, "Dr. Turtil was required to evaluate in an ongoing fashion whether the plaintiff's condition had changed, including how the patient was responding to a particular treatment course."  (Id.).  Dr. Appelbaum concluded, based on Dr. Turtil's records and the testimony of both parties, that Dr. Turtil performed the required evaluation at each visit.

 Fifth, with respect to plaintiff's claim based on Dr. Turtil's communications with plaintiff's wife, Dr. Appelbaum concluded "[n]either the discussions with the plaintiff's wife nor the decision not to share those discussions with the plaintiff represent an ethical violation, conflict of interest or departure from the standard of care."  (Appelbaum Report at 10).  Dr. Appelbaum opined Dr. Turtil did not share confidential information with plaintiff's wife, and further opined "[g]iven Mr. Song's willingness to have his wife participate in his treatment and

15

no indication that he ever asked Dr. Turtil not to speak to his wife, Dr. Turtil's contact with her to provide assistance in monitoring and managing the patient's condition did not constitute an ethical violation." (Id). Dr. Appelbaum further opined Dr. Turtil's recommendation that "Mrs. Song leave the house after listening to her account of her interactions with" plaintiff "was entirely for reasons related to her safety" and "was permissible, if not required." (Id.).

In addition, Dr. Appelbaum opined that a psychiatrist may, but need not, inform a patient about a call from a third party, "especially when sharing the information could be detrimental to the parties involved." (Appelbaum Report at 10). He also noted Dr. Turtil informed plaintiff at multiple visits that he had received calls from plaintiff's wife in early 2020, and "the subject matter of the calls was discussed during several of his sessions." (Id.). Dr. Appelbaum further opined that, after plaintiff terminated the doctor-patient relationship, Dr. Turtil was not required to inform plaintiff that Mrs. Song had called him.

Sixth, with respect to plaintiff's claim that Dr. Turtil failed to provide adequate care after plaintiff terminated the doctor-patient relationship, Dr. Appelbaum opined he could "confidently state that Dr. Turtil did not owe Mr. Song aftercare in August 2020, nor was it a departure from the standard of care to not call the plaintiff or schedule a follow-up appointment with the plaintiff in August 2020." (Appelbaum Report at 8). Dr. Appelbaum also opined "there was no gap in [plaintiff's] treatment or delay in his access to psychiatric care," as plaintiff conceded he began seeing another psychiatrist in June 2020.

Finally, regarding causation, Dr. Appelbaum concluded "nothing the defendant did or did not do contributed to the plaintiffs' injuries. Any allegations of PTSD, emotional injuries, lost wages, or custody issues decided adversely to the plaintiff are related to the plaintiff's own actions and not to any aspect of Dr. Turtil's treatment." (Appelbaum Report at 11).

16

Dr. Turtil has therefore made a sufficient showing that he did not deviate from accepted standards of medical care or proximately cause plaintiff's alleged injuries, and plaintiff, who offered no expert testimony or evidence to rebut Dr. Turtil's prima facie case, has failed to demonstrate the existence of a triable issue of fact.  See Doane v. United States, 369 F. Supp. 3d at 446.

Accordingly, summary judgment must be granted on plaintiff's medical malpractice claims.

III.    Defamation Claim

Plaintiff's defamation claim is premised on allegedly false statements Dr. Turtil made to Connie Ritzler, the custody evaluator in plaintiff's divorce proceedings.

Dr. Turtil argues plaintiff's defamation claim fails because his statements were not defamatory or false.

As the Court finds Dr. Turtil's statements to Ms. Ritzler are protected by privilege, the Court need not decide whether the statements were defamatory or false.

A.    Legal Standard

Under New York law, the elements of a defamation claim are:  "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." Albert v. Loksen, 239 F.3d 256, 265–66 (2d Cir. 2001) (citing Dillon v. City of New York, 261 A.D.2d 34, 37–38 (1st Dep't 1999)).

New York "[c]ourts have long recognized that the public interest is served by shielding certain communications, though possibly defamatory, from litigation, rather than risk stifling

them altogether." <u>Stega v. N.Y. Downtown Hosp.</u>, 31 N.Y.3d 661, 669 (2018).  And "there can be little doubt" about the "social utility in encouraging the disclosure of information which may assist an agency . . . in formulating its recommendations concerning matters involving the best interests of infant children." <u>Garson v. Hendlin</u>, 141 A.D.2d 55, 62–63 (2d Dep't 1988).

"When compelling public policy requires that the speaker be immune from suit, the law affords an absolute privilege, while statements fostering a lesser public interest are only qualifiedly privileged." <u>Rosenberg v. MetLife, Inc.</u>, 8 N.Y.3d 359, 365 (2007).

"Absolute privilege, which entirely immunizes an individual from liability in a defamation action, regardless of the declarant's motives, is generally reserved for communications made by individuals participating in a public function, such as judicial, legislative, or executive proceedings." <u>Stega v. N.Y. Downtown Hosp.</u>, 31 N.Y.3d at 669.  For example, "statements made during the course of a judicial or quasi-judicial proceeding are clearly protected by an absolute privilege as long as such statements are material and pertinent to the questions involved." <u>Rosenberg v. MetLife, Inc.</u>, 8 N.Y.3d at 365.  And "the absolute privilege can extend to preliminary or investigative stages of the process, particularly where compelling public interests are at stake." <u>Id.</u>; <u>Sinrod v. Stone</u>, 20 A.D.3d 560, 562 (2d Dep't 2005) ("[C]laims challenging the complaints of misconduct filed with the Grievance Committee by the defendants were absolutely privileged.").

At least one New York court has held absolute privilege extends to out-of-court statements made to a court-appointed evaluator during the evaluator's investigation.  <u>55th Mgmt. Corp. v. Goldman</u>, 1 Misc. 3d 239, 243, 248 (Sup. Ct. N.Y. Cty. 2003) (noting the extension of absolute privilege to such statements was a matter of first impression).  The court concluded absolute immunity was appropriate because "the court evaluator serves as an investigative agent

of the court and acts on behalf of the court" and the defendant's statements were "pertinent to the litigation," a guardianship proceeding for an alleged incapacitated person.   (Id. at 248). Although "in a vast majority of such cases, some person interviewed by a court evaluator will have a highly charged view of a person or entity involved with the alleged incapacitated person, which views may prove to be inaccurate or unrealistic," the court reasoned "these are matters which must be investigated and addressed by a court evaluator without hindrance or reservation, for even the wildest accusations may hold a germ of truth which leads to a development of facts germane to an accurate assessment." Id. at 247.  In addition, "the statement [was] made during the course of a proceeding at which the statement might possibly be identified and challenged" at a hearing. Id. at 246; cf. Toker v. Pollak, 44 N.Y.2d 211, 222 (1978) ("To clothe with absolute immunity communications made to a body acting in other than a quasi-judicial capacity communications which because of the absence of a hearing may often go unheard of, let alone challenged, by their subject would provide an unchecked vehicle for silent but effective character assassination.").

Even if not protected by absolute privilege, a statement may nonetheless be "subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral." Chandok v. Klessig, 632 F.3d 803, 814 (2d Cir. 2011).  To rebut the assertion of qualified privilege and survive summary judgment, a plaintiff must offer evidence that the statement was made with "actual" malice, i.e., knowing or "being highly aware that it is probably false," or common-law malice, i.e., "spite or ill will." Id.  Furthermore, "common-law malice will defeat such a privilege only if it was 'the one and only cause for the publication.'" Id. (quoting Liberman v. Gelstein, 80 N.Y.2d 429, 439 (1992)).

B.    Application

Dr. Turtil's allegedly defamatory remarks were made during a telephone interview with an evaluator appointed by the court to investigate the mental health of plaintiff and his wife and to submit recommendations to the court concerning custody and parenting time arrangements. The custody dispute largely centered on how well plaintiff was managing his mental health and "the likelihood of relapse of [plaintiff's] acute mental health symptoms," including psychosis. (Custody Evaluation at 6).

The remarks at issue here—(i) Dr. Turtil diagnosed plaintiff with a hypothyroid problem, (ii) plaintiff "raised" his Zoloft on his own, (iii) plaintiff had "a history of physically aggressive behavior in 2011," and (iv) "If Mr. Song abuses his thyroid medication to feel good, he can become manic" (Custody Evaluation at 19–20)—are plainly pertinent to the custody dispute. Even if these statements were false, they implicate "matters which must be investigated and addressed" to accurately assess whether plaintiff should be given custody of his four-year-old daughter. 55th Mgmt. Corp. v. Goldman, 1 Misc. 3d at 248. Moreover, the Custody Evaluation provided a detailed account of Ms. Ritzler's interview with Dr. Turtil and the remarks Ritzler considered in making her determination, enabling plaintiff to "identif[y] and challenge[ ]" the veracity of Dr. Turtil's statements in a custody hearing. Id. at 246. Accordingly, public policy justifies extending absolute privilege here.

Even if not protected by absolute privilege, Dr. Turtil's statements are, at a minimum, protected by qualified privilege. Dr. Turtil made the allegedly defamatory remarks to a court-appointed evaluator "whose possession of the allegedly defamatory information could contribute to the lawful protection of [plaintiff's daughter's] best interests." See Garson v. Hendlin, 141 A.D.2d at 63 (qualified privilege extended to statements "unofficially submit[ed]" to the county

probation department by the aunt of a mother involved in a child custody dispute, to influence the department's custody recommendation, when the statements were made at the mother's request and largely based on the aunt's personal knowledge).

Moreover, no reasonable juror could conclude, based on the record here, that spite or ill will toward plaintiff "was the one and only cause for" Dr. Turtil's statements, or that he made the statements while "being highly aware that [they were] probably false." <u>Chandok v. Klessig</u>, 632 F.3d at 813.  Indeed, Ms. Ritzler found **Dr. Turtil was "empathic to Mr. Song"** (Custody Evaluation at 6) and recommended the court give "serious consideration" to having Dr. Turtil resume as plaintiff's psychiatrist, given Dr. Turtil's "extensive knowledge of the medical issues involved as well as his empathic understanding of the family." (<u>Id</u>. at 7).  Furthermore, Dr. Turtil spoke to Ritzler only <u>after</u> plaintiff authorized him to communicate with her about plaintiff's "[m]edical information," including his "exam results" and "prognosis."  (Medical Records at 162).

Accordingly, summary judgment must be granted on plaintiff's defamation claim.

IV.     <u>Negligent Infliction of Emotional Distress Claim</u>

Plaintiff's NIED claim is premised on Dr. Turtil's purportedly improper communications with plaintiff's wife, which plaintiff contends caused his wife to call the police, apply for a restraining order, and insist upon "severely limit[ing]" plaintiff's visitation with his daughter (AC ¶ 69), and further caused plaintiff to suffer from PTSD, depression, and anxiety "so debilitating I am not able to work my regular job."  (<u>Id</u>. ¶ 70).

To prevail on a negligent infliction of emotional distress claim under New York law, a plaintiff must demonstrate (i) the defendant breached a duty of care owed to the plaintiff, and (ii)

plaintiff's emotional distress "was a direct, rather than a consequential, result of the breach." Ornstein v. New York City Health & Hosps. Corp., 10 N.Y.3d 1, 6 (2008).

Here, Dr. Appelbaum concluded Dr. Turtil's communications with plaintiff's wife constituted neither an ethical violation nor a departure from the standard of care, and opined that the purpose of these communications was to monitor plaintiff's condition and/or help to ensure the safety of plaintiff and his family.  Dr. Appelbaum further concluded plaintiff's alleged "PTSD, emotional injuries, lost wages, [and] custody issues" were a result of plaintiff's own actions, not any negligence by Dr. Turtil.  (Appelbaum Report at 11).  No evidence in the record raises a genuine issue of fact that Dr. Turtil breached a duty of care to plaintiff by communicating with plaintiff's wife, or that the harm plaintiff suffered was "a direct, rather than a consequential result of" Dr. Turtil's purported negligence.  Ornstein v. New York City Health & Hosps. Corp., 10 N.Y.3d at 6.

Accordingly, summary judgment must be granted on plaintiff's NIED claim.

**CONCLUSION**

The motion for summary judgment is GRANTED.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is directed to terminate the motion (Doc. #71) and close this case.

Chambers will mail a copy of this Opinion and Order to plaintiff at the address on the docket.

Dated: February 27, 2023
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge